## Reading Trust Co. v. Hutchison

*Richard Stevens,* for plaintiff.

*Arnold C. Rapoport,* for defendants.

KOCH, P. J., October 20, 1964.—On March 27, 1963, plaintiff entered judgment against defendants on a judgment note for $1302 dated March 11, 1963, and given by defendants to Gracious Living, Inc., payable in 60 monthly installments of $21.70 each. The payee corporation discounted the note with the plaintiff on or about March 15, 1963.

Defendants, on November 7, 1963, secured a rule to open judgment and an answer was filed on February 10, 1964. Depositions were taken on April 17,

1964, and thereafter the matter came before us upon argument.

The petition avers, and there is testimony in the depositions to support it, that on or about March 7, 1963, an agent of Gracious Living, Inc. called upon defendants and identified himself as a "demonstrator" of water softening equipment. It is also alleged that upon completion of a demonstration the representative explained the cost of purchasing the equipment and indicated that Gracious Living, Inc., would install it on a four months trial basis if defendants would give a list of their friends and neighbors and then permit a demonstration in the Hutchison home. The arrangement also provided for compensation to them if sales resulted from such lists. Defendants maintain that the agent "asked the defendants to sign a form which he could show to his boss to prove that he had made the demonstration and also as a bond to cover the unit while it was on the property of the defendants and until they decided to keep it. Defendant signed both of these forms."

The petition also avers that it was not until defendants received from plaintiff an installment book on March 27, 1963, that they realized "that they had been tricked into signing a contract and a judgment note."

Plaintiff Trust Company avers that it was not a party to the transaction; that it took the note in the normal course of business and that it had no knowledge of the representations made by the agent of Gracious Living, Inc. Plaintiff bank also denies that "plaintiff knew, or should have known that agents of the corporation had been in constant difficulty due to fraudulent business practices, yet they continued and still continue doing business with the corporation."

At the outset it must be said that the petitioners have not established that plaintiff had any knowledge

of fraudulent business practices. The only witness called by the petitioners in support of this claim was an employe of Reading Trust Company, Mr. Bashore, and this testimony in no sense can be interpreted as showing that his employer had any knowledge of facts which would remove it from the status of a holder in due course.

The Uniform Commercial Code, April 6, 1953, P. L. 3, sec. 3-302, 12A PS §3-302, provides as follows:

"(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith including observance of the reasonable commercial standards of any business in which the holder may be engaged; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

"(2) . . .

"(3) . . .

"(4) . . ."

The crux of petitioners' position is that even though plaintiff may have had no specific knowledge of the circumstances surrounding the execution of the note section 3-305 (2) (c) of the Uniform Commercial Code, 12A PS §3-305, defeats its rights as a holder in due course. This portion of the code is as follows:

"To the extent that a holder is a holder in due course he takes the instrument free from

"(1) . . .

"(2) All defenses of any party to the instrument with whom the holder has not dealt except

"(c) Such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms."

The Uniform Commercial Code Comment to the foregoing subsection is as follows:

"Paragraph (c) of subsection (2) is new. It follows the great majority of the decisions under the original Act in recognizing the defense of 'real' or 'essential' fraud, sometimes called fraud in the essence or fraud in the factum, as effective against a holder in due course. The common illustration is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that his signature on the instrument is ineffective because he did not intend to sign such an instrument at all. Under this provision the defense extends to an instrument signed with knowledge that it is a negotiable instrument, but without knowledge of its essential terms.

"The test of the defense here stated is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the age and sex of the party, his intelligence, education and business experience; his ability to read or to understand English, the representations made to him and his reason to rely on them or to have confidence in the person making them; the presence or absence of any third person who might read or explain the instrument to him, or any other possibility of obtaining independent information; and the apparent necessity, or lack of it, for acting without delay.

"Unless the misrepresentation meets this test, the defense is cut off by a holder in due course."

We are in accord with the views expressed in this Comment. In this position we are supported by such cases as The First National Bank of Philadelphia v.

Anderson, 7 D. & C. 2d 661. See also Equitable Discount Corp. v. Fischer, 12 D. & C. 2d 326.

We do not agree with the petitioners' contention that this case presents the classic illustration of a maker who was "tricked" into signing a note in the belief that it was another document. While we do not condone some of the high-pressure tactics which were used in this case, nevertheless, a reading of the depositions persuades us that upon taking into consideration the factors of excusable ignorance of the contents of the writing signed the judgment should not be opened.

An analysis of the factors shows that the husband petitioner, age 48, is a high school graduate and is employed as a clerk; the wife, age 51, completed her junior year in high school. In addition to their undoubted ability to read and write the English language and their high degree of intelligence as indicated by their depositions neither of them could establish any basis which would indicate that they had any reason to have confidence in the representations made by the agent for Gracious Living, Inc.

In further analyzing the factors we find that there was a third person present on the occasion of the signing, Mr. Albert Mitchell, an uncle of Mrs. Hutchison. He, too, is a high school graduate, and despite his presence, was not asked by the petitioners for advice.

The test of "apparent necessity, or lack of it, for acting without delay" when applied to the facts before us shows the following testimony of Mr. Hutchison, page 35:

"Q. Was there any pressing necessity that night that you sign the agreement then? Were you going to lose something if you didn't sign it that night?

"A. What are you talking about?

"Q. No particular reason to have to sign it that night?

"A. No.

"Q. You could have waited?

"A. Only that the representative was there and we agreed to have it come for demonstration and trial."

The emphasis placed by the petitioners upon the alleged statement of the agent that he was a demonstrator rather than a salesman is insignificant and not sufficient to impel us to open the judgment. The very nature of the work of the agent was to demonstrate his product with a view to an ultimate sale of it and was utilizing a familiar technique of the commercial world.

A weighing of the testimony of the petitioners persuades us that the financial hardship resulting from the transaction rather than fraud is the basis for their present complaints. The testimony of Mr. Bashore on this subject is enlightening, pages 6 and 7:

"Q. Subsequent to discounting this note, did Mr. Hutchison get in touch with you?

"A. Afterwards?

"Q. Afterwards.

"A. Yes, we received a letter from the Hutchisons, I think, roughly two weeks after we discounted the note.

"Q. In that letter, did they complain about any free trial or any fraud?

"A. No.

"Q. Did you have any telephone conversations with Mrs. Hutchison?

"A. Yes.

"Q. How many telephone conversations did you have?

"A. I would say two or three off hand.

"Q. Did she call you or did you call her?

"A. I believe we called her. This was after payments had become delinquent.

"Q. And they had not paid them?

"A. Yes.

"Q. When you spoke to them, you spoke to Mrs. Hutchison?

"A. Yes, mainly.

"Q. Did you ever talk to Mr. Hutchison?

"A. I may have on occasion. I'm not sure.

"Q. What did she say?

"A. Mrs. Hutchison complained about the same thing that they had in their earlier letter, simply that they could not afford to make the payments.

"Q. And that's all?

"A. Later, I discussed as to whether or not this payment of $15.00 a month was impossible. We checked their credit and knew their credit rating was a good one and they had an income and should have been able to pay it. I found that this was not the case, that they couldn't pay it, but they apparently found they could buy a water softener somewhere else cheaper or that the interest was too high. At that time and throughout any of the conversations, nothing was ever mentioned with regard to fraud or anything of that nature."

Petitioners call to our attention Resh v. First National Bank of Allentown,* 93 Pa. 397. In that case upon a suit in assumpsit by the bank against the maker of a promissory note the maker, who could not read or write the English language, offered to prove that the note was procured by fraud; that he went to the bank to receive payment of a certificate of deposit and that when the money was paid he complied with a request to sign a paper as a receipt, which turned out to be the note on which suit was brought. The Supreme Court held that this offer was improperly rejected by the lower court and a new trial was granted.

The case before us is in no way factually similiar to

---

* We take judicial notice of the fact that this banking institution which was dissolved in 1877 has no relationship to the existing The First National Bank of Allentown.

Resh and it is clear that the rights of a holder in due course were not there involved.

Our review of the depositions and applicable provision of the Uniform Commercial Code, supra, persuades us that the petitioners have not met the burden of establishing the circumstances necessary to open the judgment. This burden has not been changed since the enactment of the Uniform Commercial Code and it is one which must be proved by evidence which is clear, precise and convincing: Sterling E. & F. Co. v. Peterson, 409 Pa. 435.

*Order*

Now, October 20, 1964, the rule to show cause why the judgment in the above case be opened is discharged and the petition dismissed.